678 A.2d 815

**Jonathan HULL, Jr.**

v.

**HANNAHSTOWN MUTUAL INSURANCE
COMPANY, Appellant.**

Superior Court of Pennsylvania.

Argued April 30, 1996.

Filed June 26, 1996.

Stephen P. McCloskey, Washington, DC, for appellant.

Nancy D. Vernon, Uniontown, for appellee.

Before POPOVICH, EAKIN and HESTER, JJ.

HESTER, Judge.

This action arose after appellant, Hannahstown Mutual Insurance Company, refused to cover a March 3, 1991 house fire, under a homeowner's insurance policy issued to appellee, Jonathan Hull, Jr. Coverage was denied based upon appellant's determination that the fire was started intentionally by appellee. We are constrained to reverse and remand for a new trial.

Appellee instituted this action against appellant seeking to recover under the homeowner's insurance policy, and the case proceeded to jury trial. Appellee, the first witness, testified as follows. Appellee purchased the house in question, located on McClellandtown–Edenborn Road in Adah, Fayette County, in July, 1990, and he began to reside in it. His wife, from whom he has been separated for twelve to fourteen years, lived approximately two miles from the house. Appellee purchased the house for $14,500, and the previous owner accepted a private mortgage in the amount of $11,000 from appellee. Appellee owed $1,700 on the mortgage at the time of the fire.

After appellee purchased the home, he and one of his children made renovations to the property. Prior to the fire, appellee secured homeowner's insurance from appellant in the amount of $30,000, more than twice the purchase price. After

appellee "put new siding on the home and new paneling" and new carpeting, he reinsured the house for $69,000. Notes of Testimony, 10/17/94, at 20. After the fire, appellee signed a proof of loss, in which he made a sworn declaration that the amount of loss he sustained for the house and contents was $83,289, and he claimed that he placed in the house $14,000 in personal property between August, 1990, when he purchased it, and March, 1991, when it burned. Thus, the remainder of the claim was based on appellant's position that the $14,500 house he purchased six months prior to the fire was worth $69,289 because he had paneled four rooms, put siding on the outside, and carpeted the interior of the home. However, appellee was not able to recall at trial the cost of the new carpet, paneling, and siding which resulted in his house increasing in value by $54,789.

The fire, which began at approximately midnight, occurred while appellee was in Ohio visiting a friend. Appellee testified that he locked the house securely before going to Ohio and that he was the only person with a key to the house.

When the insurance adjuster and a state trooper interviewed appellee following the fire, the first words appellee said to them were "I was out of town. I was in Ohio. Here are my receipts." *Id.* at 68. Appellee made these statements before he was informed that anyone was claiming that the fire was arson. Interestingly, the following exchange also occurred at trial:

Q Now, when you remodeled the house after the fire, you told us about the different things that you did and the places you purchased the materials [to remodel the house]. Do you have receipts for those?

A Some I have and some of them got burnt up.

Q How could receipts get burned up?

A They was in Catherine's [appellee's wife] house when her house burnt last March.

Q So Catherine's house burned too?

A Yes—

[APPELLEE'S COUNSEL]: Objection, Your Honor, on relevance.

THE COURT: We will overrule the objection because he's the one that said [it].

*Id.* at 69–70.

John Felio testified first for the defense. He was driving past the house on March 3, 1991, at approximately midnight. He saw smoke coming from the house and told his girlfriend and son, who were passengers in the truck he was driving, to summon the fire department. Mr. Felio approached the house and opened the front door "[r]elatively easy." *Id.* at 93. He stopped trying to enter the house when nobody answered his calls.

Edenborn Volunteer Fire Chief Charles J. Kormanik testified that approximately sixty firefighters responded to the fire. Chief Kormanik asked State Trooper Dennis Smith, who is the state fire marshal for Fayette County, to investigate the fire because the Chief observed an unusual burn pattern in the house and he was not able to determine the cause of the fire.

Trooper Smith, stipulated to be an expert in the field of fire investigation, testified as follows. He detected the odor of kerosene upon entering the house, there was an intense fire at the point of origin, and the carpet exhibited pour pattern burns, which indicated that something was poured on the carpeting and ignited. He indicated that "an accelerant of some kind" created the pour burn pattern in appellee's house. *Id.* at 106. Laboratory analysis revealed that kerosene was used as the accelerant. Based on his investigation, Trooper Smith concluded that the fire was "not an accidental fire. It was definitely an arson, a deliberately set fire." *Id.* at 110.

When Trooper Smith interviewed appellee, appellee told him that there was "only one key to the house," that appellee had it, that "[a]ll of the windows and doors were locked" when he left for Ohio, and that the "basement door was padlocked from the outside." *Id.* Appellant secured its own fire investigator, Robert G. Stewart, who came to the same conclusions as Trooper Smith about the fire.

Richard Barnett then was called to the stand. Mr. Barnett had given appellant's agents a sworn statement in which he indicted that at appellee's request, he and appellee's son had set the fire in question. Mr. Barnett was not willing to testify at trial. However, Mr. Barnett made it abundantly clear that his unwillingness to testify was not based on the fifth amendment but was related to threats he had received either from appellee or his family. Even though Mr. Barnett indicated that he did not wish to invoke his fifth amendment privilege against self-incrimination and even though he indicated he was aware of that privilege, the court stated that he was not "going to force him to testify when he's putting himself in jail" and that he would not allow Mr. Barnett to testify. *Id.* at 153.

Nancy Barnett, Richard's wife, testified that the night before the fire, appellee brought a kitchen dinette set, two chests of drawers, a stereo, speakers, two statutes, a trunk, and a clock into her residence. When appellee brought the items to her home, he said, "It's a damn shame. You work for things all your life, like pictures, important papers, sentimental things with sentimental values, to go up in smoke." *Id.* at 157. Appellee also said that he needed money that night so he could go to Ohio.

Based on this evidence, the jury awarded appellee $42,000. This appeal followed denial of post-trial motions. Appellant claims that the trial court erred in refusing to allow Mr. Barnett to testify when he indicated that he did not wish to invoke his fifth amendment privilege against self-incrimination. We agree, reverse and remand for a new trial.

The house fire occurred on March 3, 1991; the trial court was concerned that Mr. Barnett faced charges for committing arson because the statute of limitations for arson is five years. The trial court, in its opinion in support of its decision, was under the impression that Mr. Barnett had invoked his fifth amendment right to self-incrimination. The trial court opined that since Mr. Barnett did face arson charges, it properly had upheld Mr. Barnett's invocation of that privilege.

However, our review of the testimony reveals that Mr. Barnett specifically stated that he was aware of his fifth amendment privilege against incrimination but that he did *not* wish to invoke it. Indeed, in light of his prior sworn statement, he may have waived his right to invoke that privilege. *See Commonwealth v. Boyle,* 498 Pa. 486, 447 A.2d 250 (1982). Nonetheless, the record establishes that the witness never invoked the privilege. Mr. Barnett was reluctant to testify for reasons completely unrelated to the fifth amendment and which were related to threats from appellee and his family.

The exchange is as follows:

THE COURT: Mr. Barnett, I'm calling you to the stand because I understand that you're being subpoenaed to testify here and that you've given a sworn statement on another occasion. I wanted to find out if you wish to testify today?

THE WITNESS: No, sir, I don't.

THE COURT: Are you going to invoke a privilege against testifying?

THE WITNESS: I appreciate the Fifth Amendment, yeah.

THE COURT: Do you feel that that might incriminate you, what you're going to testify to today?

THE WITNESS: No, not so much as incriminate me as to the circumstances involved.

THE COURT: Mr. McCloskey, do you have anything?

MR. McCLOSKEY: Yes, I do.

### DIRECT EXAMINATION

BY MR. McCLOSKEY:

Q. Mr. Barnett, if I understand your testimony correctly, you're not concerned about your Fifth Amendment privilege against self-incrimination. You have another reason for not testifying here today; is that correct?

A. *Correct.*

Q. And—

THE COURT: That's not going to work, Mr. McCloskey. If what you're telling me is true and he has statements to the effect that have been shown me, no matter what he does is going to incriminate him. I know what he said and you know what he said, but that can't be right and I'm not going to force him to testify under those circumstances.

MR. McCLOSKEY: *Your Honor, the only purpose of my asking him questions was to get to his real reason for not wanting to come forward.*

THE COURT: His real reason is that he can incriminate himself. I mean I don't care what he says. Can you not incriminate him?

MR. McCLOSKEY: No, no.

THE COURT: Then what, do you think I'm stupid? I'm going to force him to testify when he's putting himself in jail? I can't do that and you shouldn't put me in that position.

You can step down, Mr. Barnett. We don't have any more questions.

*Id.* at 152–53 (emphases added).

While the trial court implies that there was a discussion outside the presence of the jury where Mr. Barnett did invoke his fifth amendment right, we cannot locate that discussion in the transcript. Furthermore, there is no break in the transcript which indicates that such a discussion occurred. What *is* clear from that transcript is that Mr. Barnett did not want to testify for reasons unrelated to the fifth amendment privilege against self-incrimination. The trial court cut short his testimony because it decided Mr. Barnett faced a risk of criminal prosecution, a risk that Mr. Barnett no longer faces since five years have elapsed since the arson.

 Our Supreme Court has held that fifth amendment rights are personal to the individual and may not be asserted by another. *Commonwealth v. L.E. Wilson Co.*, 458 Pa. 470, 328 A.2d 502, 504 n. 2 (1974). As Mr. Barnett did not invoke the privilege and as it is clear that no one is permitted to invoke such a privilege other than the person to whom it

applies, the trial court improperly invoked that privilege on behalf of Mr. Barnett. The fact that Mr. Barnett's proposed testimony, which was that appellee's son and he burned down the house at appellee's request, was relevant to appellee's right to recover, a new trial is required. As we have granted appellant a new trial, we need not address its claim that remittitur was denied improperly.

Judgment reversed. Case remanded for a new trial. Jurisdiction relinquished.